**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**CORA ANN PINSON,**

> **Plaintiff,**

**v.**                                    **Case No.: 3:12-cv-7255**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

> **Defendant.**

**MEMORANDUM OPINION**

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401-433. The case is presently before the Court on the parties' motions for judgment on the pleadings. (ECF Nos. 11, 12). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 7, 8). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court **FINDS** that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

**I.    Procedural History**

Plaintiff Cora Ann Pinson ("Claimant") filed for DIB on August 5, 2010, alleging a disability onset date of August 1, 2009, (Tr. at 160), due to depression, lower back pain, joint pain, foot pain, and headaches. (Tr. at 184). She subsequently amended her onset

date to July 14, 2009. (Tr. at 167). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 73-75, 80-82). Claimant requested a hearing, (Tr. at 89), which was held on February 16, 2012 before the Honorable Brian LeCours, Administrative Law Judge ("ALJ"). (Tr. at 31-70). By decision dated March 9, 2012, the ALJ determined that Claimant was entitled to benefits commencing on January 15, 2012, but was not entitled to benefits prior to January 15, 2012. (Tr. at 11-24). The ALJ's decision became the final decision of the Commissioner on August 31, 2012, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

On November 1, 2012, Claimant brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed his Answer and a Transcript of the Proceedings on January 4, 2013. (ECF Nos. 9, 10). Thereafter, the parties filed their briefs in support of judgment on the pleadings. (ECF Nos. 11, 12). Accordingly, this matter is ripe for resolution.

## II.    Claimant's Background

Claimant was 52 years old at the time of her alleged disability onset, (Tr. at 160), and 55 years old at the time of the ALJ's decision. (Tr. at 10). She is a high school graduate and communicates in English. (Tr. at 38). Claimant has prior work experience as an economic service worker at the West Virginia Department of Health and Human Resources. (Tr. at 185).

## III.    Summary of ALJ's Findings

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520(a)(4). First, the ALJ determines whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). Second, if the claimant is not gainfully employed, then the inquiry is whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). Third, if the claimant suffers from a severe impairment, the ALJ determines whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does meet or equal a listed impairment, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). In the fourth step, the ALJ ascertains whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability and the burden shifts to the Commissioner to prove the final step. *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). Under the fifth and final inquiry, the Commissioner must demonstrate that the claimant is able to perform other forms of substantial gainful

activity, while taking into account the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the ALJ "must follow a special technique" when assessing disability. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents the findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the Regulations. *Id.* § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 404.1520a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the degree of functional limitation against the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §

- 4 -

404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment that neither meets nor equals a listed mental disorder, then the ALJ assesses the claimant's residual mental function. 20 C.F.R. § 404.1520a(d)(3).

In this case, the ALJ determined as a preliminary matter that Claimant met the insured status requirement of the Social Security Act through December 31, 2014. (Tr. at 13, Finding No. 1). The ALJ acknowledged that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged disability onset date. (*Id.*, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of major depressive disorder, myofascial pain of the cervical spine, myofascial pain of the lumbar spine, and osteoarthritis of the joints. (*Id.*, Finding No. 3). The ALJ considered Claimant's complaints of migraines, hyperlipidemia, hypertension, and incontinence to be non-severe. (Tr. at 13).

At the third inquiry, the ALJ concluded that Claimant's impairments, either individually or in combination, did not meet or equal the severity of one of the listed impairments. (Tr. at 13-16, Finding No. 4). The ALJ then found that Claimant had the RFC to:

> [P]erform light work as defined in 20 C.F.R. 404.1567(b) except that she is occasionally able to balance, stoop, kneel, crouch, crawl and climb ramps and stairs; never able to climb ladders, ropes and scaffolds; use of the right upper extremity to push/push *[sic]* within the lifting restriction is limited to frequently; use of the right upper extremity for handling objects is limited to frequently; must avoid concentrated exposure to extreme cold; must avoid concentrated exposure to hazardous conditions such as unprotected heights and dangerous machinery; must have three restroom breaks, each of five minutes, per workday; work must consist of simple, routine tasks, with short, simple instructions, and only simple work-related decisions with few workplace changes; there can be only occasional interaction with the general public, fellow workers, and supervisors.

(Tr. at 16-22, Finding No. 5). As a result, under the fourth inquiry, Claimant was found unable to perform any of her past relevant work. (Tr. at 22, Finding No. 6). The ALJ then reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 22-23, Finding Nos. 7-10). The ALJ considered that (1) Claimant was an individual closely approaching advanced age on the alleged disability onset date, and that her age category changed to an individual of advanced age on January 15, 2012; (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the ALJ's determination that Claimant was "not disabled." (Tr. at 22, Finding Nos. 7-9). Given these factors and Claimant's RFC based upon all of her impairments, the ALJ relied upon the testimony of a vocational expert in finding that prior to January 15, 2012, Claimant could perform various occupations that existed in significant numbers in the national and regional economy. (Tr. at 22-23, Finding No. 10). At the light level, Claimant could function as a night cleaner, price maker, or house sitter; at the sedentary level, Claimant was capable of performing jobs such as grader/sorter, product inspector, or final assembler. (Tr. at 23). However, the ALJ found that beginning on January 15, 2012, when Claimant's age category changed, there were no jobs that existed in significant numbers in the national economy that Claimant could perform. (Tr. at 23-24, Finding No. 11). On this basis, the ALJ concluded that Claimant was not under a disability prior to January 15, 2012, but became disabled on that date, as defined by the Social Security Act. (Tr. at 24, Finding No. 12).

## IV.   **Claimant's Challenges to the Commissioner's Decision**

Claimant challenges the Commissioner's assessment of her credibility. (ECF No. 11). According to Claimant, the ALJ (1) failed to follow the "mutually supportive test," as

objective medical evidence on record supports her allegations of physical and mental impairments, (*Id.* at 6-8); (2) improperly used "boilerplate" language regarding Claimant's credibility, (*Id.* at 8-9); and (3) failed to fairly consider Claimant's work history and testimony. (*Id.* at 9-10).

## V.   <u>Relevant Medical Records</u>

The Court has reviewed the transcript of proceedings in its entirety including the medical records in evidence. The Court has confined its summary of Claimant's treatment and evaluations to those entries most relevant to the issues in dispute.

### A.  Treatment Records

On December 9, 2009, Claimant received a full physical examination from Natavoot Chongswatdi, M.D. at University Physicians & Surgeons, for the purpose of establishing a primary care physician. (Tr. at 383-87). Claimant reported experiencing symptoms of depression, which included wanting to be alone, sleepiness, crying, lack of motivation, and agitation, as well as problems with hyperlipidemia and hypertension. (Tr. at 383). Claimant's physical exam was essentially within normal limits as to her general appearance, neck, eyes, ears, nose, pharynx, lungs, cardiovascular system, and abdomen. (Tr. at 384). Dr. Chongswatdi assessed Claimant with hypertension, hyperlipidemia, and depression, as well as knee joint pain, for which he ordered x-rays. (Tr. at 384-85). Claimant's knee x-ray results revealed "mild osteoarthritic changes with minimal spurring of the tibial spines" in her right knee, and "minimal spurring of the tibial spines compatible with mild arthritic changes" in her left knee. (Tr. at 386-87). Thus, Claimant's x-ray results supported a diagnostic impression of "mild arthritic changes in the knees." (Tr. at 387).

On January 11, 2010, Claimant reported that her knee pain was about the same,

and that medication did not help. (Tr. at 397). She reported no symptoms of hyperlipidemia, and described past medication that had previously helped with her swelling from hypertension. (*Id.*). Claimant's physical examination was essentially within normal limits, except that edema was observed. (Tr. at 397-98). Dr. Chongswatdi adjusted her medication accordingly, and ordered a follow-up visit in two months. (Tr. at 398).

On February 14, 2010, Claimant was admitted to the Cabell Huntington Hospital, (Tr. at 302-45), with complaints of headaches which began the prior evening. (Tr. at 305). Claimant reported experiencing nausea, posterior pain, throbbing, and some pain in her neck. (*Id.*). Although Claimant reported a history of headaches, she stated that she had experienced "no bad ones for [the] last few years." (*Id.*). The following day, February 15, 2010, Claimant was discharged at her request. (Tr. at 327). Claimant reported feeling better after receiving medication and stated that her pain was almost gone. (*Id.*). Hospital staff likewise observed that Claimant's eyes were wide open and she was no longer shielding them. (*Id.*).

On March 15, 2010, Claimant met with Dr. Chongswatdi to discuss the migraines she had experienced the prior month. (Tr. at 403). Claimant reported that she used to have migraines "a lot" but "not much now," as the last one had occurred two years prior. (*Id.*). Claimant also reported experiencing knee and back pain. (*Id.*). She described her knee pain as constant, was worse with motion, better after loosening, and not radically different walking up and down steps, and rated it at 6 on a pain scale of 10. (*Id.*). Claimant reported that her back pain "goes down left leg hip to knee outside, [and] goes numb at times, out of [the] blue" when sitting or standing. (*Id.*). Claimant's physical exam was essentially within normal limits, except that Dr. Chongswatdi observed

"tenderness on palpitation of the knee" and that "pain was elicited by motion of the knee." (Tr. at 403-04). Otherwise, Claimant's knee appearance and motion were normal, while there was no muscle spasm of the knee. (Tr. at 404).  Dr. Chongswatdi adjusted her medication and ordered a follow-up appointment in two months. (*Id.*).

On May 9, 2010, Claimant was admitted to the Cabell Huntington Hospital, (Tr. at 346-71), with complaints of severe chest pain and a migraine headache with associated nausea and vomiting. (Tr. at 366). Claimant denied ever having had chest pain before. (Tr. at 352). On May 10, 2010, Claimant was referred for a cardiology consultation, which included a full physical examination as well as cardiology testing. (Tr. at 346-55). Claimant's cardio report reflected "sinus rhythm with first degree AV block," "long QT interval" and an "abnormal ECG." (Tr. at 346). Claimant's left heart catheterization, selective coronary angiography and left ventriculography reflected "normal coronary arteries," "preserved LV function" and "elevated LVEDP" (left ventricular end diastolic pressure." (Tr. at 349-50). The examining physician observed "mild distress secondary to the headache and chest pain" and a "2/4 systolic ejection [heart] murmur," which Claimant reported was "an old finding since childhood." (Tr. at 368). Otherwise, Claimant's heart rate and rhythm, skin, HEENT, neck, lungs, abdomen, musculoskeletal, and neurological systems were intact, while her chest x-ray was "negative for acute processes." (Tr. at 368-69). Accordingly, Claimant was assessed with "fairly typical angina chest pain in presentation," while pulmonary embolism, pneumonia, and myocardial infarction (heart attack) were essentially ruled out. (Tr. at 369). Claimant was prescribed medication for her chest pain and scheduled to undertake a Cardiolite stress test. (*Id.*). She was also prescribed medication for her hypertension, hyperlipidemia, depression/anxiety, and migraine headaches. (Tr. at 369-

70). Later that day, Claimant was discharged in stable condition with instructions to follow up with her physician in 2-3 weeks. (Tr. at 362).

On May 17, 2010, Claimant attended an appointment with Dr. Chongswatdi, during which she reported that she "gets down, depressed," but was "planning to go back to work" and "does not want to see psych at this time." (Tr. at 405). Claimant also reported difficulty sleeping due to waking up every two hours from pain in her shoulders and legs. (*Id.*). Claimant's physical exam was essentially within normal limits. (Tr. at 405-06). Dr. Chongswatdi adjusted Claimant's Celexa prescription and ordered a follow-up visit in two months. (Tr. at 406).

On June 23, 2010, Claimant was seen by Samuel Stewart, D.O. at University Physicians & Surgeons for swelling in her legs and feet. (Tr. at 407). Claimant reported experiencing swelling over the past 10-15 years, which had increased in the past month, and was worse in the evening after being on her feet. (*Id.*). There was no redness associated, but that she did have generalized pain below the knees. (*Id.*). Claimant's physical exam was within normal limits or otherwise appropriate except for "bilat[eral] 1+ edema below the knees." (Tr. at 408). Claimant was assessed with venous insufficiency and prescribed Lasix for 7 days, with instructions to elevate her feet and wear compression hose as needed. (*Id.*).

On July 19, 2010, Claimant attended an appointment with Dr. Chongswatdi, during which she reported that the swelling in her feet and ankles was painful to touch, although every few days it improved after elevation. (Tr. at 412). She also reported that the Laxis helped with the swelling. (*Id.*). Claimant's physical exam was essentially within normal limits. (Tr. at 412-13). Dr. Chongswatdi adjusted her medication and ordered a follow-up visit in three months. (Tr. at 413).

On October 18, 2010 Claimant complained that her "mood still feels down" but denied suicidal or homicidal ideations. (Tr. at 501). Claimant indicated that in the past, Wellbutrin seemed to help with her depression symptoms. (*Id.*). Claimant's physical exam was essentially within normal limits. (Tr. at 501-02). Dr. Chongswatdi indicated that Claimant had agreed to see a psychiatrist, and ordered a follow-up visit in two months, with instructions to call for a psychiatric referral if wanted. (Tr. at 502).

On November 15, 2010, psychiatrist Muhammad Ali Hyder, M.D. of Associates in Psychology & Therapy ("APT Inc.") conducted a psychiatric assessment of Claimant, who sought to begin mental health treatment. (Tr. at 468-71). Claimant reported that she had taken psychotropic medication for the last 10 years, but had never seen a psychiatrist. (Tr. at 468). In Claimant's history of present illness, Dr. Hyder speculated that "[t]he guilt and remorse of leaving her children was probably the beginning point of her mood disorder," 15 to 20 years prior. (*Id.*). Claimant reported symptoms of "tiredness, lack of emotion, lack of motivation, guilty feelings and low self-esteem," as well as increased appetite. (*Id.*). Claimant denied a history of generalized anxiety disorder or panic disorder, but gave significant history of compulsions, particularly in the past five years. (Tr. at 469). Claimant reported "that she feels she is being watched all the time" and that she "hears whispering voices," but has boosted her ability to turn them off. (*Id.*). However, Claimant denied any formal paranoid or persecutory delusions. (*Id.*).

Claimant's mental status exam reflected that her mood was depressed and her affect was congruent. (Tr. at 470). Claimant denied auditory/visual hallucinations but reported that she "hears whispering sounds that she cannot make out." (*Id.*).  She also reported paranoid ideations, but no formal paranoid or persecutory delusions. (*Id.*).

Otherwise, Claimant's orientation, thought processes, insight, impulse control, and judgment were appropriate, and she denied suicidal or homicidal ideations. (*Id.*). Accordingly, Dr. Hyder diagnosed Claimant with "major depressive disorder with psychotic features, rule out Bipolar II disorder" along Axis I, and assigned her a GAF[1] score of 45.[2] (Tr. at 471). Claimant was accepted at APT Inc. and scheduled to begin regular psychotherapy and pharmacological management. (*Id.*). Dr. Hyder opined that Claimant's "remorse and guilt about not being very strong and leaving her children behind" have "definitely played a part in her depressive episodes during the last 20 years," in addition to low self-esteem and unresolved grief issues relating to the loss of her mother ten years prior. (*Id.*). Dr. Hyder discussed medications at length, and also encouraged Claimant to get involved with some exercise and regular counseling. (*Id.*). There are no subsequent mental health treatment records contained in the administrative record.

On December 20, 2010, Claimant reported to Dr. Chongswatdi that her mood was about the same and she was not sleeping as much, but that she had a therapist appointment scheduled for later that afternoon. (Tr. at 511). Claimant also reported having a cough for the past 2 weeks that was bad at night. (*Id.*). Claimant's physical exam was essentially within normal limits. (Tr. at 512). Dr. Chongswatdi prescribed

---

[1] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). On the GAF scale, a higher score correlates with a less severe impairment. It should be noted that in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders*, DSM-5, the GAF scale was abandoned as a measurement tool.

[2] A GAF of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job).

cough syrup to Claimant and ordered a follow-up visit in six months. (*Id.*).

In May 2011, Claimant received chiropractic adjustments from Lavalette Chiropractic on four occasions. (Tr. at 592-93). On May 5, 2011, Claimant's chiropractor diagnosed her with lumbalgia, thoracalgia, and sacroiliitis bilaterally, and referred Claimant for a spine x-ray. (Tr. at 592). Although x-ray results were "markedly limited due to patient body habitus," they did reflect that her "alignment appears grossly maintained" and "no displaced fracture [was] seen." (Tr. at 593). On May 9, 2011, Claimant reported continued pain in the lumbar spine, while her chiropractor observed "reduced from normal lumbar ROM," thoracic fixation hypomotility, and also that Claimant's "seated SLRs are uncomfortable to the lower back at 90° bilaterally." (Tr. at 592). Additionally, Claimant's "ROM [was] painful in the lumbar spine" and "she ha[d] fixation [in] both SI joints." (*Id.*). On May 13, 2011, Claimant reported doing about the same, while her chiropractor observed "reduced from normal lumbar ROM," thoracic fixation, and lumbar hypertonicity." (*Id.*). On May 17, 2013, Claimant reported that since her last visit, she had experienced pain in the lumbar spine and TL region, hypertonicity in both areas, and tender tenderness in both regions. (*Id.*).

On June 16, 2011, Claimant met with Twyla Twillie, M.D. at King's Daughters Family Care Center for the purpose of establishing a primary care physician. (Tr. at 588-90). Claimant sought a referral for psychiatric counselor Dr. Kumar, and reported that she had stopped taking Prozac because she did not think it was helping her depression. (Tr. at 588). Claimant also complained of headaches and back pains, and reported visiting the emergency room every 2-3 months due to migraine headaches, but that she did not take any regular medication other than shots in the emergency room. (*Id.*). Claimant reported that her lipids and hypertension were doing well. (*Id.*). Claimant's

physical exam was essentially within normal limits, except for observed lumbar muscle tenderness. (Tr. at 589). Dr. Twillie observed normal musculoskeletal range of motion, no signs of edema, and a normal mood and affect. (*Id.*). Dr. Twillie assessed Claimant with hypertension, degenerative disc disease in the lumbar spine, reflux, depression, migraine, and fatigue, and referred her to Dr. Kumar for psychotherapy. (Tr. at 589-90). On June 23, 2011, Claimant reported that the psychiatric clinic refused to see her without the doctor's prior approval. (Tr. at 585). Claimant's physical exam was essentially within normal limits. (Tr. at 586). Dr. Twillie gave Claimant a Vitamin B12 shot for her B12 deficiency, refilled her prescriptions, and provided her with a new psychiatric referral. (Tr. at 587).

On November 3, 2011, Claimant was seen by Dr. Twillie, with complaints of pain in her lower back and knees, which did not ease with medication and was exacerbated by standing and walking. (Tr. at 580). Claimant's foot swelling, however was better. (*Id.*). Claimant's physical exam was essentially within normal limits, except that Dr. Twillie observed lumbar paraspinal tenderness and stiffness and "just trace" foot edema. (Tr. at 581). Dr. Twillie assessed Claimant with degenerative disc disease in the lumbar spine, degenerative joint disease of the knee, and Vitamin B12 deficiency, and prescribed pain relief medication with instructions to follow up in one month. (*Id.*).

### B. Medical Evaluations and RFC Assessments

#### 1. *Psychological Assessments*

On September 2, 2009, Rachel Arthur, M.A. provided a psychological evaluation of Claimant consisting of a clinical interview and a mental status examination. (Tr. at 284-87). During the interview, Claimant reported experiencing depression beginning 8-9 years prior, which increased significantly in severity in July 2009, after she quit her

job of 12 years. (Tr. at 284). Claimant reported symptoms of daily depression, including lack of interest in things, loss of energy, feelings of worthlessness, feelings of hopelessness, poor concentration, suicidal ideations without intent, irritability, and increased worrying. (*Id.*). Claimant had no history of counseling or prior psychiatric hospitalizations, although she reported that prior use of Prozac had been "somewhat beneficial." (*Id.*). Claimant's activities of daily living consisted primarily of lying in bed and watching television, although she also reported performing self-care tasks independently, cooking simple meals, driving, shopping for herself, and handling her own finances. (Tr. at 285).

Claimant's mental status exam reflected that her mood was depressed, while her appearance, attitude, social, speech, orientation, and affect were within normal limits or otherwise appropriate. (*Id.*). Claimant reported "some recent unusual perceptual experiences consisting of hearing whispering voices beginning 'a month or so ago'" but otherwise her thought content and thought processes were normal. (*Id.*). Her insight appeared adequate, while her judgment appeared mildly deficient. (*Id.*). Claimant also reported occasional suicidal ideations without intent. (*Id.*). Claimant's immediate and remote memories were within normal limits while her recent memory was mildly impaired. (*Id.*). Claimant's concentration was mildly deficient, while her psychomotor activity was within normal limits. (Tr. at 285-86). Accordingly, Ms. Arthur diagnosed Claimant with "major depressive disorder, single episode-moderate" along Axis I, and assigned her a GAF score of 55,[3] based upon Claimant's report of symptoms. (Tr. at 286). Ms. Arthur opined that Claimant's prognosis was "fair, but would possibly

---

[3] GAF scores between 51 and 60 indicate "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 34.

improve if appropriate psychological and psychotropic interventions are utilized," and recommended individual and group psychotherapy, as well as possible psychotropic medication such as an antidepressant with anxiolytic effects. (*Id.*).

On September 30, 2009, Lisa Tate, M.A. provided a psychological evaluation consisting of a clinical interview and a mental status examination. (Tr. at 288-93). During the interview, Claimant reported experiencing depression beginning in 2001 or 2002, which had worsened over time. (Tr. at 289). She reported symptoms of loss of energy, loss of interest in activities, irritability, social withdrawal, crying, feelings of hopelessness, feelings of helplessness, and feelings of worthlessness. (*Id.*). Claimant's mental status exam reflected that her mood was depressed, affect was restricted, and recent memory was moderately deficient. (Tr. at 290). Otherwise, her orientation, thought processes, thought content, insight, judgment, immediate memory, remote memory, concentration, and psychomotor behavior were all within normal limits or otherwise appropriate. (*Id.*). Claimant also reported no unusual perceptual experiences, and denied suicidal or homicidal ideations. (*Id.*). Accordingly, Ms. Tate diagnosed Claimant with "major depressive disorder, single episode, moderate" along Axis I, based upon Claimant's report of symptoms. (Tr. at 290-91). Claimant described activities of daily living, consisting of watching television and fixing a sandwich daily; showering every few days; cooking, going to the grocery store, and visiting her sister once per week; and running the sweeper, doing laundry, and playing bingo on an approximately monthly basis. (Tr. at 291). Ms. Tate observed that Claimant's social functioning, pace, persistence, and concentration were all within normal limits. (*Id.*).

On September 1, 2010, Ms. Tate provided her second psychological evaluation of Claimant consisting of a clinical interview and mental status evaluation. (Tr. at 437-42).

Claimant again reported having problems with depression for several years, which had worsened over time. (Tr. at 438). Claimant reported experiencing symptoms of depression at all times and denied experiencing any significant period of time free of symptoms. (*Id.*). She identified symptoms including loss of energy, loss of interest in activities, feelings of worthlessness, social withdrawal, crying, feelings of hopelessness and helplessness, varied appetite, and difficulty sleeping, as well as irritability, hatefulness, and being short-tempered. (*Id.*). Claimant's mental status exam reflected that her mood was depressed, affect was restricted, and concentration was mildly deficient. (Tr. at 439). Otherwise, her orientation, thought processes, thought content, insight, judgment, immediate memory, recent memory, remote memory, and psychomotor behavior were all within normal limits or otherwise appropriate. (*Id.*). She also denied any perceptual disturbances or suicidal or homicidal ideations. (*Id.*). Ms. Tate diagnosed Claimant with "major depressive disorder, single episode, severe" based upon her report of symptoms and observed mood and affect during the interview. (Tr. at 440). Claimant described activities of daily living, consisting of watching television, playing cards on the computer three hours on and off throughout the day, napping, and fixing something to eat daily; showering every few days; going to the store weekly; cooking, doing laundry, and visiting her sister twice per month; and washing dishes and attending doctor's appointments as scheduled once per month. (*Id.*). Ms. Tate observed that Claimant's social functioning, pace, and persistence, were all within normal limits, while her concentration was mildly deficient. (*Id.*).

On November 10, 2010, Ms. Arthur provided her second psychological evaluation of Claimant consisting of a clinical interview and a mental status examination. (Tr. at 463-65). During the interview, Claimant reported experiencing daily depression

occurring constantly without any period of remission since losing her job in July 2009, although her depression originally began 8-9 years prior. (Tr. at 463). Claimant's daily symptoms included lack of interest in things, hypersomnia, loss of energy, feelings of worthlessness, feelings of hopelessness, poor concentration, irritability, and increased worrying. (*Id.*). Claimant also reported that she sometimes feels like she's being watched or followed, that she worries about how people perceive her, and that her paranoia began a couple months prior. (*Id.*). Claimant had no history of counseling or prior psychiatric hospitalizations, although she reported that she had been taking Celexa for 3-4 years although it was not very beneficial. (*Id.*). Ms. Arthur observed that Claimant "did not report taking this medication a year ago during a prior evaluation." (*Id.*). Claimant's mental status exam reflected that her mood was depressed and her affect was somewhat restricted. (Tr. at 464). Otherwise, her appearance, attitude, socializing, speech, and orientation were within normal limits or otherwise appropriate. (*Id.*). Claimant reported some recent unusual perceptual experiences consisting of "seeing shadows and stuff. . . it's rare," but otherwise her thought content and thought processes were normal. (*Id.*). Her insight appeared adequate, while her judgment appeared mildly deficient. (*Id.*). Claimant denied suicidal ideations. (*Id.*). Claimant's immediate and remote memories were within normal limits. (*Id.*). Claimant's concentration was mildly deficient, while her psychomotor activity was within normal limits. (Tr. at 464). Accordingly, Ms. Arthur diagnosed Claimant with "major depressive disorder, single episode-moderate" along Axis I, and assigned her a GAF score of 50, based upon Claimant's report of symptoms. (Tr. at 464-65). Ms. Arthur again opined that Claimant's prognosis was "fair, but would possibly improve if appropriate psychological and psychotropic interventions are utilized," and recommended individual and group

psychotherapy, as well as continued psychotropic intervention. (Tr. at 465).

On December 3, 2010, Holly Clooonan, Ph.D. provided a Psychiatric Review Technique and Mental RFC Opinion of Claimant. (Tr. at 472-89). Based upon available medical records, Dr. Cloonan diagnosed Claimant with "MDD, single episode, moderate to severe," (Tr. at 475), and opined that Claimant was moderately limited in her ability to maintain social functioning; mildly limited in her activities of daily living and her ability to maintain concentration, persistence, or pace; and had experienced no episodes of decompensation for extended duration. (Tr. at 482). Dr. Cloonan further observed that "Claimant appears mostly credible although allegations of symptom severity with regard to mental functional capacity are not supported by MER in file from two recent evaluations," as the "mental status exam findings in both instances revealed mental functional capacity no more than mildly limited." (Tr. at 484). However, Dr. Cloonan went on to note that "Claimant may have some moderate limits in social functional capacity consistent with observations at the most recent evaluation with evaluating source statement per." (*Id.*).

In her mental RFC opinion, Dr. Cloonan opined that Claimant was not significantly limited in any capacity regarding her understanding and memory, sustained concentration and persistence, and adaptation. (Tr. at 486-87). Regarding Claimant's social functioning, Dr. Cloonan opined that she was moderately limited in her abilities to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; but not significantly limited in her abilities to ask simple questions or request assistance, or to maintain socially appropriately behavior and to adhere to basic standards of neatness and

cleanliness. (Tr. at 487). Dr. Cloonan further noted that Claimant "may have the above moderate limits in social functional capacity associated with her mental condition," but that "she is able to learn and perform work-like activities in a setting with limited interactions with others." (Tr. at 488).

On February 14, 2011, Jeff Boggess, Ph.D. provided a Psychiatric Review Technique of Claimant. (Tr. at 513-26). Based upon the evidence on record, Dr. Boggess diagnosed Claimant with "MDD vs Bi-polar." (Tr. at 516). He opined that Claimant was mildly limited in her activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace; and that she suffered no episodes of decompensation of extended duration. (Tr. at 523). Dr. Boggess noted that Claimant "appears only partially credible as per allegations," particularly in light of her November 15, 2010 APT Inc. intake evaluation. (Tr. at 525). Dr. Boggess observed that her mental status exam showed alleged "symptoms of 'whispers' to be questionable and not indicative of thought disorder delusions," and that "[t]hese were denied two months earlier at [her] consultative evaluation." (*Id.*). Similarly, Dr. Boggess observed that Claimant "also states that sometimes she 'sees things' that others don't on AFR but does not mention this at either exam." (*Id.*). Regarding Claimant's report of "memory problems" in her most recent Adult Function Report, Dr. Boggess observed that the "CE notes normal memory functioning and mild concentration/social limitations." (*Id.*). Dr. Boggess also noted Claimant's activities of daily living, which included driving, shopping in stores, paying bills, managing accounts, watching television, and visiting with family. (*Id.*).

### 2. Physical Assessments

On September 24, 2009, Eli Rubenstein, M.D. provided an x-ray report of

Claimant's lumbar spine. (Tr. at 301). The report revealed that Claimant had "minimal narrowing of L5-S1" but "the rest of the interspaces and spine" were normal. (*Id.*). Likewise, there was "normal alignment of the lumbar spine," no compression fracture or appendicular defect, no scoliotic deformity, and her sacro-iliac joints were normal. (*Id.*).

On September 27, 2009, Kip Beard, M.D. conducted an internal medicine examination of Claimant, which included an interview and review of her medical history and a full physical examination. (Tr. at 296-300). Claimant reported a history of headaches which began at age 25 and subsequently worsened, mid to low back pain with gradual onset beginning around age 40, as well as hypertension and depression. (Tr. at 296-97). Claimant reported that her headaches occur two or three times per month, lasting from five hours to all day long and registering up to 10 on a pain scale of 10. (Tr. at 296). Claimant rated her back pain, which is constant and runs down her legs to her heels, at 5 on a pain scale of 10. (*Id.*). Claimant also reported that her pain is exacerbated by prolonged standing, bending, stooping and housework. (Tr. at 297).

Claimant's physical exam reflected that she could stand unassisted, "arise from a seat and step up and down from the examination table," and appeared comfortable seated, but "uncomfortable supine with back pain." (Tr. at 298). Dr. Beard's examination of Claimant's HEENT, neck, chest, cardiovascular system, abdomen, extremities, neurological system were all essentially unremarkable. (Tr. at 298-99). As for Claimant's musculoskeletal system, there was no observed tenderness, warmth or swelling, or limitation in range of motion in her cervical spine, arms, knees, and ankles/feet. (Tr. at 298-99). Claimant's grip strength measured 22, 26, and 26 kg of force in the right hand, and 26, 18, 26 kg of force in the left hand, but was otherwise unremarkable. (Tr. at 299). Claimant's lumbosacral spine revealed "some mild pain on

forward bending with paravertebral tenderness, but no spasm," and "flexion to 80 degrees" with normal range of motion otherwise. (*Id.*). Claimant's seated and supine straight leg raising test was to "90 degrees with back pain." (*Id.*). Otherwise, she could stand on one leg alone, had no radicular complaints, and her hips were without pain or tenderness and had normal range of motion. (*Id.*). Claimant was also "able to heel-walk, toe-walk, tandem walk, and able to squat halfway with back pain." (*Id.*).

Dr. Beard then diagnosed Claimant with obesity, headaches, and "chronic thoracolumbar strain" based upon "x-ray evidence of early spondylosis, degenerative disk *[sic]* disease." (*Id.*). Dr. Beard further observed in Claimant's x-ray that "she had some early ostephytes and maybe some diminished disk space between the T12, L1 and L5-S1 regions," and noted that her back examination "revealed some mild pain with tenderness, some mild motion loss and negative straight leg raising, normal reflexes and no appreciable radiculopathy." (Tr. at 300). Regarding Claimant's headaches, Dr. Beard observed that "[h]er description includes some migrainous features, but is not classic for that," and that her neurologic examination was unremarkable. (*Id.*).

On October 7, 2010, Drew. C. Apgar, J.D., D.O. F.C.L.M., conducted an internal medicine examination of Claimant, in which he reviewed her medical history and conducted a full physical examination of Claimant. (Tr. at 443-61). In relaying her history of present illness, Claimant reported a history of chronic pain, including pain in her knees, and chronic neck and back pain; a history of depression and insomnia; and hypertension and hyperlipidemia. (Tr. at 444). In her review of systems, Claimant admitted weakness and fatigue, headache, confusion and memory loss, depression and hallucination, hypertension, dyspnea with exertion, and pain in her joints, neck, and back, as well as muscle weakness. (Tr. at 446-47). During Claimant's physical exam, Dr.

Apgar observed generally that Claimant could "get on and off [the] examination table without difficulty," showed "good posture while seated and while standing," was "able to move about the room without difficulty," and was "able to dress and undress without difficulty." (Tr. at 447). Claimant's speech, skin, head, eyes, ears, nose, mouth, neck, heart, lungs, and abdomen were all unremarkable. (Tr. at 448-50). Claimant's grasp was diminished in the right hand, but her fine coordination, pinch, and manipulation were intact bilaterally, she could perform rapid alternating hand movements without difficulty, and stereognosis was present. (Tr. at 451, 454, 457). Claimant's hip range of motion was compromised bilaterally; her gait was mildly antalgic and not fully weight-bearing, but otherwise steady and deliberate, not wide-based, and she did not require a cane or other ambulatory device. (Tr. at 451, 454, 459). Dr. Apgar diagnosed Claimant with chronic pain syndrome (cervical pain-myofacial pain, lumbar pain-myofascial pain, joints-osteoarthritis), as well as hypertension, hyperlipidemia, and depression by history. (Tr. at 453). Although he noted that Claimant reported feeling depressed, Dr. Apgar observed that Claimant was "friendly, cooperative and forthcoming," and her interests were not constricted. (Tr. at 454). Claimant also demonstrated awareness of the events of the world; displayed concern for maintaining current relationships which are supportive; demonstrated good hygiene and effort at appropriate personal appearance; and demonstrated an awareness of means and willingness to improve her circumstances. (Tr. at 454). Dr. Apgar further observed that "Claimant's mental status was essentially normal in spite of past medical history," and that her understanding and memory (long term and short term), concentration and focus, and interaction and adaptation were all intact or otherwise appropriate throughout the examination. (Tr. at 455). Based upon his objective findings, Dr. Apgar opined that Claimant "would have no

difficulty with sitting, hearing and speaking" and that "[t]here may be some difficulty with standing, walking, traveling, lifting, carrying, pushing, pulling, and handling objects with the dominant hand." (*Id.*).

On December 3, 2010, consultative evaluator G. Singh provided a Physical RFC opinion of Claimant. (Tr. at 490-97). Dr. Singh opined that Claimant could occasionally lift or carry up to 20 pounds, frequently lift or carry up to 10 pounds, stand and/or walk with normal breaks for a total of 6 hours in an 8-hour workday, sit with normal breaks for a total of about 6 hours in an 8 hour workday, and was unlimited in her ability to push or pull. (Tr. at 491). Claimant could never climb ladders, ropes, or scaffolds, but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (Tr. at 492). Claimant had no manipulative, visual, or communicative limitations. (Tr. at 493-94). Regarding environmental limitations, Dr. Singh opined that Claimant should avoid concentrated exposure to extreme cold and to hazards. (Tr. at 494). Dr. Singh further noted that Claimant's "allegations are partially credible since the evidence does not substantiate Claimant's allegations to the degree alleged." (Tr. at 495).

On February 28, 2011, Uma Reddy, M.D. provided a Physical RFC opinion regarding Claimant. (Tr. at 527-34). Based upon Claimant's medical records, Dr. Reddy opined that Claimant could occasionally lift or carry up to 20 pounds, frequently lift or carry up to 10 pounds, stand and/or walk with normal breaks for a total of 6 hours in an 8-hour workday, sit with normal breaks for a less than 6 hours in an 8 hour workday, and was unlimited in her ability to push or pull. (Tr. at 528). Claimant could occasionally climb ramps, stairs, ladders, rope, and scaffold, and could occasionally balance, stoop, kneel, crouch, and crawl. (Tr. at 529). Claimant had no manipulative, visual, or communicative limitations. (Tr. at 530-31). Regarding environmental

limitations, Dr. Reddy opined that Claimant should avoid even moderate exposure to hazards; avoid concentrated exposure to extreme cold, extreme heat, vibration, and fumes; and was unlimited in her exposure to wetness, humidity, and noise. (Tr. at 531). Dr. Reddy further observed that Claimant's "activities of daily living indicate light work," and limited Claimant accordingly. (Tr. at 532).

## VI.   **Scope of Review**

The issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. The Fourth Circuit has defined substantial evidence as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Thus, the ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v.*

*Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

The Court has considered all of Claimant's challenges in turn and finds them unpersuasive. To the contrary, having scrutinized the record as a whole, the Court concludes that the decision of the Commissioner finding Claimant not disabled is supported by substantial evidence.

## VII.   <u>Analysis</u>

Claimant contends that the ALJ improperly assessed her credibility. (ECF No. 11 at 5). She argues the ALJ failed to apply the proper legal standard for assessing credibility, failed to articulate the reasons for discounting Claimant's credibility, and failed to adequately consider Claimant's work history and testimony. (ECF No. 11 at 6-10). In contrast, the Commissioner argues that the ALJ properly followed the two-step process articulated in the Regulations, and that his credibility determination is supported by substantial evidence on the record. (ECF No. 12 at 13-19). Having carefully reviewed the ALJ's credibility assessment, the Court agrees with the Commissioner.

Pursuant to the Regulations, the ALJ will evaluate a claimant's report of symptoms using a two-step method. 20 C.F.R. § 404.1529; *see also Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). First, the ALJ must determine whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* § 404.1529(a). That is, a claimant's "statements about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s)

which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* § 404.1529(a). If the intensity, persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186. In evaluating a claimant's credibility regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources. 20 C.F.R. § 404.1529(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques. *Id.* § 404.1529(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* § 404.1529(c)(3); *see also Craig*, 76 F.3d at 595; SSA 96-7P, 1996 WL 374186, at *4-5.

In *Hines v. Barnhart*, the Fourth Circuit Court of Appeals stated that:

Although a claimant's allegations about her pain may not be discredited

> solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (4th Cir. 2006) (citing *Craig*, 76 F.3d at 595). Thus, the ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 96-7P, 1996 WL 374186, at *6.

Social Security Ruling 96-7p provides further guidance on how to evaluate a claimant's credibility. For example, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations ... for the purposes of judging the credibility of the individual's statements." *Id.* at 7. However, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.*

Here, the ALJ provided a detailed overview of Claimant's testimony, which he then compared against the relevant medical evidence and consultative evaluations, in order to assess her credibility. (Tr. at 16-22). The ALJ found that Claimant's impairments could reasonably be expected to cause the symptoms she alleged, but that

Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms were only partially credible. (Tr. at 17). As the ALJ observed, Claimant's testimony of disabling symptoms of depression was inconsistent with the objective medical findings and her continued activities of daily living. (Tr. at 20). Likewise, Claimant's testimony regarding her physical impairments was also only partially credible, given that "the extent to which the claimant alleges [her] symptoms and physical limitation are excessive and are not supported by objective medical findings." (Tr. at 22). Both findings are supported by substantial evidence on the record.

Although Claimant testified to debilitating symptoms of depression, (Tr. at 43), she apparently did not ever seek psychological or mental health treatment until November 15, 2010, the date of the only mental health treatment record contained in the administrative record. (Tr. at 468). Agency evaluations by Ms. Arthur, Ms. Tate, Dr. Cloonan, and Dr. Boggess are largely inconsistent with Claimant's testimony of disabling symptoms of depression, (Tr. at 283-93, 437-42, 472-97, 513-34), as are her reported activities of daily living, which included watching television, independently performing self-care tasks such as grooming and hygiene, making simple meals, driving 20 to 30 miles per week, shopping, handling her own finances, and visiting her sister. (Tr. at 56-57, 285, 291, 440). Dr. Boggess explicitly observed that Claimant "appears only partially credible as per allegations" in light of noted inconsistencies in reported symptoms among her various psychological evaluations. (Tr. at 525). Dr. Cloonan concluded that "Claimant appears mostly credible although allegations of symptom severity with regard to mental functional capacity are not fully supported by her MER in file from two recent evaluations." (Tr. at 484). A longitudinal review of Claimant's relatively infrequent primary care treatment notes also reflect only limited difficulty in light of Claimant's

report of symptoms, her doctors' physical examinations, and her correspondingly conservative treatment, (Tr. at 384-87, 397-98, 403-08, 412-13, 501-02, 511-12, 577-78). In short, the ALJ conducted a thorough analysis of the relevant evidence, appropriately weighed the medical source opinions, and provided a logical basis for discounting the credibility of Claimant's statements regarding the intensity, persistence, and limiting effects of her symptoms, in accordance with the applicable Regulations.

In addition, the errors Claimant assigns to the ALJ's credibility determination are meritless. First, Claimant argues that under the "mutually supportive test" recognized in *Coffman v. Bowen*, 829 F.2d 514 (4th Cir. 1987), she satisfies the requirements of 42 U.S.C. § 423(d)(5)(A) because her testimony is supported by objective medical source findings. (ECF No. 11 at 7). Claimant misinterprets the holding in *Coffman*. There, the issue was not whether the ALJ erred in assessing the claimant's credibility, but whether the ALJ applied the appropriate legal standard in weighing the treating physician's opinion that the claimant was disabled from gainful employment. *Coffman*, 829 F.2d at 517-18. The Fourth Circuit found that the ALJ had misapplied the relevant standard by discounting the physician's opinion due to the alleged lack of corroborating evidence, when the correct standard was to give the opinion great weight *unless* persuasive contradictory evidence was present in the record. *Id.* at 518. The Fourth Circuit then pointed out that evidence supporting the physician's opinion, in fact, existed in the record, noting "[b]ecause Coffman's complaints and his attending physician's findings were mutually supportive, they would satisfy even the more exacting standards of ... 42 U.S.C. § 423(d)(5)(A)." *Id.* In the present case, the sole issue is Claimant's credibility. *Coffman* offers no applicable "test" for assessing a claimant's credibility and, consequently, is inapposite. As the written decision plainly reflects, the ALJ applied the

correct two-step process in determining Claimant's credibility.

Second, Claimant argues that the ALJ's use of "boilerplate" credibility language warrants remand on the ground that "such language provides no basis to determine what weight the ALJ gave the Plaintiff's testimony." (ECF No. 11 at 9). It is well established that "ALJ's have a duty to explain the basis of their credibility determinations, particularly where pain and other nonexertional disabilities are involved." *Long v. United States Dep't of Health and Human Servs.*, No. 88-3651, 1990 WL 64793, at *2 n.5 (4th Cir. May 1, 1990). Social Security Ruling 96-7p instructs that "[w]hen evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individuals statements." SSR 96-7p, 1996 WL 374186, at *4. Moreover, the ALJ's credibility finding "cannot be based on an intangible or intuitive notion about an individual's credibility." *Id.* Rather, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." *Id.* Thus, a "bare conclusion that [a claimant's] statements lack credibility because they are inconsistent with 'the above residual functional capacity assessment' does not discharge the duty to explain." *Kotofski v. Astrue*, No. 2010 WL 3655541, 2010 WL 3655541, at *9 (D. Md. Sept. 14, 2010); *see also Stewart v. Astrue*, 2:11-cv-597, 2012 WL 6799723, at *15 n.15 (E.D.Va. Dec. 20, 2012). To the contrary, the decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *4. Here, the ALJ admittedly used "boilerplate" language in finding that "the claimant's statements

concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment." (Tr. at 17). However, the ALJ did not stop his analysis with only that bare conclusion. He went on to discuss and weigh the longitudinal evidence of record, as well as all of the consultative examinations and evaluations, before concluding that Claimant's statements were only partially credible in light of her ongoing activities of daily living and the objective medical findings. (Tr. at 20, 22). Accordingly, the ALJ's credibility finding was sufficiently articulated, as he explained his rationale with references to the specific evidence that informed his decision.

Third, Claimant argues that the ALJ failed to fairly consider her work history and testimony. (ECF No. 11 at 9). According to Claimant, her thirty-year work history warrants a finding that her testimony is fully credible. (*Id.* at 9-10). Although an ALJ may consider a claimant's work history, it is but one factor and in no way dispositive of her credibility. *See Sondergeld v. Colvin*, No. 1:12-cv-161-RJC, 2013 WL 3465294, at *6 (W.D.N.C. July 10, 2013). Moreover, the role of the Court is not to re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d. at 1456. Indeed, when reviewing an ALJ's credibility determinations for substantial evidence, the Court may not replace its own credibility assessments for those of the ALJ; rather, the Court must scrutinize the evidence to determine if it is sufficient to support the ALJ's conclusions. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (quoting *Craig*, 76 F.3d at 589). Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984) (citing

*Tyler v. Weinberger*, 409 F. Supp. 776 (E.D. Va. 1976)). As discussed above, the ALJ's credibility determination is supported by substantial evidence on the record.

Consequently, the Court finds that the ALJ followed the proper agency procedures in assessing Claimant's credibility.

## VIII. <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:** September 30, 2013.

Cheryl A. Eifert
United States Magistrate Judge